UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-v-<br><br>RAYMOND KORNEGAY,<br><br>                                Defendant. | 13 Cr. 428 (PAE)<br><br>OPINION & ORDER |

PAUL A. ENGELMAYER, District Judge:

In December 2020, the Court denied a motion from defendant Raymond Kornegay for compassionate release from Federal Correctional Institution ("FCI") Gilmer, in West Virginia, pursuant to 18 U.S.C. § 3582(c)(1)(A). *See* Dkt. 129 ("CR Decision"). The Court has since received a *pro se* motion from Kornegay, seeking the same relief. Dkt. 139 ("Kornegay Mem."). The Court thereafter granted Kornegay's motion, Dkt. 140, for reappointment of the counsel who assisted him with his initial motion, Dkt. 141. The Court has received letters from appointed counsel in support of Kornegay's release, *see* Dkts. 144 ("Def. Mem."), 148 ("Def. Mem. 2"), 149 ("Def. Mem. 3"), and the Government's opposition, Dkt. 147, ("Gov't Mem."), filed after the first of these letters. For the reasons that follow, the Court denies the motion.

I.      **Background**[1]

        A.      **Kornegay's Offense, Trial, and Sentencing**

Between December 2009 and March 2010, Kornegay participated in a series of nine robberies of cellphone stores in Manhattan. Kornegay and his co-conspirators used wire cutters

---

[1] The Court substantially draws this background from its December 2020 decision resolving Kornegay's first motion for compassionate release. The Court has removed internal citations within that decision from the summary here.

and knives to separate cell phones and other electronic devices from displays in Manhattan T-Mobile and AT&T stores. When store employees would try to prevent the theft, the robbery crew would threaten force and violence. This included making threatening statements to employees and security guards, forcing employees out of the way, and displaying the wire cutters and/or knives they had.

On January 15, 2014, following a three-day trial, Kornegay was convicted of conspiracy to commit Hobbs Act robbery and three substantive Hobbs Act robberies, in violation of 18 U.S.C. § 1951. On February 6, 2015, in sentencing Kornegay, the Court found that he qualified as a career offender pursuant to U.S.S.G. § 4B1.1(a) due to two prior felony convictions for robbery in the second degree under New York state law. The Court sentenced Kornegay to 180 months' imprisonment—below the effective Guidelines range of between 210 and 262 months' imprisonment—to be followed by three years of supervised release.

Kornegay has been incarcerated since May 8, 2013 (that is, for approximately 118 months). He has thus served approximately 65% of his stated prison term and, assuming good behavior, is scheduled for release on May 15, 2026, in approximately three years and two months.

### B. Kornegay's First Motion for Compassionate Release

On October 5, 2020, the Court received a *pro se* motion from Kornegay seeking early release in light of the COVID-19 pandemic, along with a motion requesting the appointment of Criminal Justice Act counsel. Dkt. 118. On November 6, 2020, Kornegay's appointed counsel filed a memorandum in support of his motion. Dkt. 123. Counsel predominantly argued that compassionate release is warranted in light of the pandemic and Kornegay's diagnosis of Type 2 diabetes, which poses an increased risk of complications from COVID-19, and because

2

Kornegay had served a substantial portion of his original sentence and has demonstrated a capacity for rehabilitation. *Id.* at 5–11. The Government opposed the motion. Dkt. 128.

The Court found that Kornegay likely satisfied § 3582(c)'s threshold requirement of an extraordinary and compelling reason for release:

> As the Government has conceded, Kornegay's diagnosis of Type 2 Diabetes may well be an extraordinary and compelling reason for release—although that risk is somewhat tempered by his relatively young age of 38. The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration. The crowded nature of federal detention centers in particular presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread. And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself. For these reasons, in the past months, various courts, including this one, have ordered the temporary release of inmates held in pretrial or presentencing custody and the compassionate release of high-risk inmates serving federal sentences.

CR Decision at 5 (internal citations and footnotes omitted).

However, the Court held, Kornegay failed the next step in the analysis, entailing consideration of the 18 U.S.C. § 3553(a) factors:

> [E]ven assuming there are extraordinary and compelling reasons for Kornegay's early release, the Court must also assure itself that release is consistent with "the factors set forth in section 3553(a) to the extent that they are applicable" before ordering any such release. 18 U.S.C. § 3582(c)(1)(A). And, in this case, the Court finds that the § 3553(a) factors, viewed collectively, are inconsistent with expediting Kornegay's release from Gilmer FCI by five and a half years, as he requests. Several of those factors—"the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law . . . [and] to provide just punishment for the offense," as well as need "to protect the public from further crimes of the defendant" and thus effect specific deterrence, 18 U.S.C. § 3553(a)—weigh heavily here.

> Kornegay's conduct in this case was terrifying and endangered public safety. As the Court reviewed at his sentencing, Kornegay, with two or three other men, would "enter a store, their identities partly concealed under hats and jackets, bearing cutting tools, brandishing wire cutters and/or knives, helping themselves to merchandise and threatening employees who got in their way and muscling others out of the way." Kornegay's actions during each robbery "created a serious risk each time that violence, maybe even deadly violence, would occur . . . . [I]t is really

3

only a matter of good fortune and good judgment by the victims that none of the robberies led to serious injury or even death." And, the Court noted, "[t]he robberies were also deeply wrongful in the way they generated fear. . . . Any incident like that would likely scar or scare an employee or, for that matter, a customer for perhaps a long time." Finally, the "sheer number of stores that were hit, nine in total, further demonstrates the seriousness of the offense." *Id.* Thus, the Court reasoned that the serious and violent nature of these actions required a substantial sentence in order "to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). That assessment remains valid.

In addition, the number of robberies—apparently led by Kornegay—demonstrated both the need for specific deterrence and a proclivity towards violence on Kornegay's part, which in turn underscores the public's interest in being protected from future marauding. And Kornegay's long criminal history reinforces these arguments for lengthy incarceration. At sentencing, the Court found he had 15 criminal history category points, independent of his status as a career offender. Particularly concerning is that he "committed this spree of nine robberies after having been prosecuted for a very similar prior robbery." As the Court noted at sentencing, given his "long record of committing serial and similar robberies, there is every reason to believe that if [Kornegay] were at large again, [Kornegay] would rob again," and thus if any sentence "will get through to [Kornegay] . . . it need[ed] to be materially longer than [his] prior ones," the longest of which was 54 months. Furthermore, Kornegay committed these robberies in his late 20s, and thus they could not be chalked up to the "immaturity and recklessness of youth." This assessment remains persuasive today. There remains a powerful interest in "protect[ing] the public from further crimes" by Kornegay. The Court does not have confidence that, if released now on account of the pandemic, Kornegay would respect and obey the law. *See* 18 U.S.C. § 3553(a)(2)(C).

Considering these factors at sentencing, the Court imposed a term of 180 months in prison. That sentence, substantial as it was, fell well below the guidelines range of between 210 and 262 months' imprisonment, and represented a downward variance from the applicable guidelines range. The Court cannot find that a sentence reduction to about half the length of that originally imposed, as Kornegay now seeks, is compatible with the important interests undergirding § 3553(a). In arguing to the contrary, Kornegay contends that his underlying medical conditions and the fact that he will soon be turning 39 will help check his recidivism. Kornegay also argues that, although his crimes were serious, as the Court noted at sentencing, the robberies "did not have violence as their objective." Finally, Kornegay stresses that he has shown a capacity for rehabilitation while incarcerated, as demonstrated by his work as an assistant cook and facility maintenance worker, as well as his completion of a number of educational and rehabilitative courses while incarcerated. In light of these factors, he contends, a sentence is warranted which is lower than that originally imposed.

4

> The Court commends Kornegay for productively using his time in prison. But none of these arguments supports reducing Kornegay's sentence by more than five years, even with credit for good time. Kornegay was already a grown man when he committed these crimes, yet he still committed violent and deeply anti-social acts. To release Kornegay this early in his term of imprisonment would disserve the interests embodied in the Court's original sentencing determination—most significantly the need for the sentence imposed to reflect the need for just punishment and the need to protect the public from future crimes. For this reason, the Court has denied compassionate release applications by many defendants which were made relatively early in their prison terms—even when a defendant had a health condition indicative of heightened vulnerability to COVID-19. . . .
>
> And Kornegay's circumstances diverge from the substantial number of defendants whose compassionate release the Court *has* granted in recent months, in recognition of the changed circumstances presented by COVID-19. Those defendants had generally served a substantially greater proportion of their sentences, such that the Court found the sentence resulting from a grant of compassionate release consistent with the § 3553(a) factors. That is not so here. The Court thus finds that the § 3553(a) factors disfavor Kornegay's release at the midpoint of his sentence.

*Id.* at 6–10 (internal citations omitted). The Court thus denied Kornegay's motion.

### C. Kornegay's Second Motion for Compassionate Release

On February 22, 2022, Kornegay, *pro se*, filed a second motion for compassionate release. On March 18, 2022, appointed counsel submitted a letter in support. On May 13, 2022, the Government submitted a letter in opposition. Appointed counsel has since submitted supplemental letters in support. Kornegay and his counsel mainly argue that Kornegay's medical conditions, the failure of the Bureau of Prisons ("BOP"), and harsh prison conditions together present extraordinary and compelling reasons supporting his release. *See, e.g.*, Kornegay Mem. at 10–23; Def. Mem. at 1–4. Kornegay's counsel also argues that recent decisional law as to the career offender guideline favors a reduction of sentence. Def. Mem. 2 at 1; Def. Mem. 3 at 1.

## II. Discussion

### A. Standards Governing Compassionate Release Motions

"[U]pon motion of the defendant," and "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," the Court may reduce such defendant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). The defendant bears the burden of proving he is entitled to compassionate release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, section 3582(c)(1)(A) did not permit defendants to initiate compassionate release proceedings; it required the BOP to seek such release on their behalf. *United States v. Phillibert*, 557 F. Supp. 3d 456, 459 (S.D.N.Y. 2021). However, "[a]s part of the First Step Act of 2018, Congress authorized courts to reduce a term of imprisonment upon motion by a defendant." *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam).

Congress tasked the Sentencing Commission with identifying the circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence. *United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020) (citing 28 U.S.C. § 994(t)). The Commission did so in U.S.S.G. § 1B1.13 and its commentary, which, *inter alia*, (1) define various circumstances that present extraordinary and compelling reasons justifying release; and (2) require that a defendant not be a danger to the safety of the community. U.S.S.G. § 1B1.13(1)–(3) & cmt. n.1. However, the guidance under this provision applies only to a "motion of the Director of the Bureau of Prisons." *Id.* § 1B1.13. It does not apply "to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to

6

consider whether any reasons are extraordinary and compelling" in such cases. *Brooker*, 976 F.3d at 236 (internal quotation marks omitted); *see also id.* at 237 ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."). Thus, when assessing a motion brought by an imprisoned defendant and not the BOP, the Court is not constrained by U.S.S.G. § 1B1.13's enumeration of extraordinary and compelling reasons and may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Id.* at 237. Even if such reasons are present, the Court must also assure itself that release is consistent with "the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).

### C. Analysis

In its December 2020 decision, the Court assumed, *arguendo*, that Kornegay's medical condition qualified as extraordinary and compelling, given the risks the COVID-19 pandemic present to him due to his Type 2 diabetes and other comorbidities, including being overweight and having high cholesterol. CR Decision at 5–6. In support of his recent motion, Kornegay and his counsel augment his conditions. They represent that he is more overweight, that he has bacteria that infect the digestive tract, that he may have an ulcer, that he has experienced a dull pain on his left ribcage / lung area, that he may have a kidney disease, and that he has hypertension. *See, e.g.*, Def. Mem. at 2. These comorbidities, counsel represent, mean that Kornegay has a much greater chance of becoming seriously ill or dying from COVID-19. *Id.* Counsel cite numerous decisions from this District granting compassionate release in light of such comorbidities. *Id.* at 2–3 (citations omitted). Counsel further represent that the BOP has

7

not been responsive to Kornegay's medical needs or furnished him medical care, enhancing the risk to him from COVID-19. *Id.* at 3.

The Court is sympathetic to Kornegay's medical conditions. Viewed in combination, these present him with an array of medical challenges that require attention and—in quantity— set his medical needs apart from those of most BOP inmates.

However, in a critical respect, Kornegay's claim of extraordinary and compelling circumstances arising from his medical conditions is far weaker now than in December 2020. That is because, effective the first half of 2021, vaccinations became available, including to BOP inmates. Such vaccinations stand to reduce consequentially the risk of contracting COVID and to reduce dramatically the adverse consequences of doing so.

In its May 13, 2022, letter, the Government represents, however, that Kornegay has been offered but refused a COVID-19 vaccine. *See* Gov't Opp. at 4 (citing BOP medical records). The submissions by Kornegay and his counsel from before the Government's letter were silent on the subject of vaccination. Even more strikingly, counsel's two letters on Kornegay's behalf filed after the Government's letter representing that he had passed up vaccination remain silent on that point. The Court is left with no choice but to infer that Kornegay, for reasons unexplained, has foregone vaccination.

In these circumstances, Kornegay's claim of heightened risk from COVID-19 cannot be taken seriously as a basis for compassionate release. As numerous courts have held, where a defendant claims comorbidities from COVID-19 but forgoes vaccination, those comorbidities are not an extraordinary and compelling reason warranting release. *See, e.g., United States v. May*, No. 18 Cr. 688 (ALC), 2022 WL 255315, at *1 (S.D.N.Y. Jan. 26, 2022) (denying compassionate release of defendant who refused vaccination and whose "medical conditions,

8

coupled with the threat of contracting COVID-19, do not establish extraordinary and compelling reasons"); *United States v. Robinson*, No. 17 Cr. 611-7 (AT), 2021 WL 1565663, at *3 (S.D.N.Y. Apr. 21, 2021) (same); *United States v. Ordonez*, No. 13 Cr. 811 (ALC), Doc. No. 765 at 3 (S.D.N.Y Mar. 8, 2021) (same); *United States v. Colon*, No. 18 Cr. 6040, 2021 WL 1246187, at *3 (W.D.N.Y. Apr. 5, 2021) (same).

And the cases in which this Court and others have released inmates based on comorbidities are easily distinguished. These overwhelmingly involved bids for release in 2020, before vaccinations became available and their efficacy established. *See, e.g.*, *United States v. Wilson*, 16 Cr. 317 (PAE), Doc. No. 656 at 4–7 (S.D.N.Y. Aug. 31, 2020) (ordering compassionate release of defendant with heightened vulnerability who had served the substantial majority of his sentence and played a low-level role in a drug trafficking conspiracy); *United States v. Simon*, 482 F. Supp. 3d 151, 157 (S.D.N.Y. 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played a low-level role in a drug trafficking conspiracy); *United States v. Davies*, 469 F. Supp. 3d 175, 180 (S.D.N.Y. 2020) (same); *United States v. Brown*, 467 F. Supp. 3d 209, 213 (S.D.N.Y. 2020) (same); *United States v. Jasper*, No. 18 Cr. 390-18 (PAE), 2020 WL 1673140, at *2 (S.D.N.Y. Apr. 4, 2020) (ordering compassionate release of defendant with an immune-inflammatory disease who had served all but 34 days of a four-month sentence). The cases on which Kornegay relies—only two of which post-date 2020—are similarly distinguished. *See, e.g., United States v. Zoquier-Solano,* No. 13 Cr. 772 (JPO), 2020 WL 6193859, at *2 (S.D.N.Y. Aug. 10, 2020); *United States v. Zukerman*, 451 F. Supp. 3d 329 (S.D.N.Y. 2020); *United States v. Salvango*, 456 F. Supp. 3d 420, 428 (N.D.N.Y. 2020), *reconsideration denied* 456 F. Supp. 3d 420, 431 (N.D.N.Y. June 22, 2020). *Contra United States v. Sosa*, No. 14 Cr. 468-1 (AT), Dkt. 548 (S.D.N.Y. Jan. 24, 2022)

9

(granting compassionate release motion, but where defendant had received all COVID-19 vaccinations available, served over 90% of his sentence, there was a high-rate of infection at his facility, and the Omicron variant posed heightened threat), *reversed on reconsideration*, 2022 WL 1690833 (S.D.N.Y. May 26, 2022) (denying compassionate release motion because petitioner had received third booster and COVID-19 rates at facility had decreased); *United States v. Minicone*, 521 F. Supp. 3d 163, 169 (N.D.N.Y. 2021) (granting compassionate release motion where 72-year-old defendant suffered from, *inter alia*, cancer and kidney disease and had served more than 75% of sentence). Kornegay has not cited any case, and the Court is unaware of any, in which a defendant who declined vaccination secured compassionate release based on claims relating to the risk of exposure to COVID-19.

With Kornegay having passed up the single step that would most decisively reduce his risk of adverse medical outcomes, the Court is less sympathetic to his claim that—independent of COVID-19—his various medical conditions are extraordinary and compelling. In any event, substantially for the reasons stated by the Government, these, while not to be minimized, have not been shown by Kornegay to be extraordinary and compelling. *See* Gov't Mem. at 4. The Court, in a separate set of orders unconnected to the application for compassionate release, has directed the BOP to vigilantly monitor Kornegay's condition and to "actively consider whether engagement of outside diagnostic professionals is warranted," while admonishing Kornegay to "cooperate with the medical professionals employed and engaged by the BOP." Dkt. 138. The Court expects the BOP and Kornegay to comply with this order and, should the BOP fail to do so, invites Kornegay's counsel to seek the Court's intervention.

The Court accordingly does not find extraordinary and compelling circumstances justifying a reduction of sentence.

Even assuming, *arguendo*, that Kornegay had availed himself of vaccination and that his medical conditions nonetheless rose to the level of extraordinary and compelling circumstances, the Court would not order his early release pursuant to § 3582(c). That is because the § 3553(a) factors, which the Court canvassed in detail at sentencing, supported—and still support—the sentence imposed. The Court here incorporates by reference its detailed remarks at sentencing, and its detailed explanation in its decision denying Kornegay's initial compassionate release motion of why the § 3553(a) factors disfavored early release. In brief: Kornegay's offense was exceptionally serious, involving robberies of nine mobile phone stores that were terrifying to employees and customers and presented posed grave threats to public safety; and he committed these crimes in the face of a long and diverse criminal history, including prior imprisonment, and at an age at which he could no longer invoke youth or immaturity as an excuse.

Defense counsel notes that, at sentencing, the Court found that the career offender Guideline applied to Kornegay, resulting in a Guideline range of 210–262 months. Def. Mem. 2 at 1. Defense counsel notes that the Second Circuit has recently held that Hobbs Act robbery and conspiracy to commit Hobbs Act robbery are not crimes of violence within the meaning of the career offender Sentencing Guideline. *See id.* (citing *United States v. Chappelle*, 41 F.4th 102 (2d Cir. 2022)); Def. Mem. 3 at 1 (same). The result, defense counsel notes, is that if Kornegay were sentenced today, the career offender Guideline would not apply and his guideline range would be between 120- and 150-months' imprisonment. Def. Mem. 2 at 1 (citing Dkt. 73 ("Sent. Tr.") at 18).

Had the Court relied on the career offender guideline range in imposing sentence, Kornegay's counsel's point would have some traction. But the Court did not do so. The Court made clear that its formal determination that the career offender guideline applied did not mean

11

that the Court was placing any weight on that Guideline. *See* Sent. Tr. at 19–20 (finding career guideline to apply "as a strict matter of Guideline math" but stating that "I am not in any way stating that I believe that the guideline range is necessarily the proper range" for Kornegay's sentence). Rather, the Court stated at the time it calculated the applicable Guideline that it anticipated imposing a below-Guidelines sentence. *Id.* at 21. And it ultimately did so, explaining that the career offender guideline yielded "way too high" a recommended sentencing range. *Id.* at 39.

To the extent the career offender guideline factored into the Court's thinking, the Court explained at sentencing, it was to underscore the policy goal undergirding that guideline: "to incapacitate the career offender and to put others on notice that chronic violence will be punished by very high prison sentences." *Id.* at 38. Those policy interests, the Court stated, applied to Kornegay, whose long criminal history put in him in criminal history category VI even without regard to the career offender guideline. *See id.* at 18. And the Court noted that the guideline that otherwise would have applied understated Kornegay's culpability, as it would yield the same result had Kornegay robbed only three stores, whereas he robbed nine. *See id.* at 38–39. The Court accordingly imposed a sentence above the Guideline range that, but for the career offender guideline, would have applied.

The Second Circuit's recent classification of substantive and conspiracy Hobbs Act robbery as other than a crime of violence—the product of its application of the "categorical" or "elements" approach to classifying prior convictions for sentencing purposes—does not at all undermine the Court's reasoning in determining the just and reasonable sentence for Kornegay. *See Chappelle*, 41 F.4th at 107. That sentence, as the Court's lengthy analysis at sentencing made clear, turned on its application of the § 3553(a) factors in his case. The Court's assessment

and conclusion remains the same today. Those factors, in the Court's considered judgment, continue today to favor the sentence imposed. For this reason, too, the Court denies Kornegay's renewed motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: April 3, 2023
       New York, New York